**JAMES L. SAPHIER AGENCY, INC.,**
**Plaintiff,**

v.

**Jules L. GREEN, Defendant.**

United States District Court
S. D. New York.
Jan. 9, 1961.

Halperin, Morris, Granett & Cowan, by Emil K. Ellis, Maurice Shire, Monte L. Morris, Solomon Granett, New York City, for plaintiff.

Reinheimer & Cohen, by Myron J. Greene, Irving Cohen, David Grossberg, New York City, for defendant.

RITTER, District Judge.

During the spring and early summer of 1953, the American Federation of Television and Radio Artists, commonly referred to in the industry as AFTRA, was evolving its Rule 12–B, which was adopted and became effective on July 23, 1953.

And, during the same time, the plaintiff James L. Saphier Agency, Inc., a California corporation, whose business was the personal representation and management of theatrical performers, the defendant Jules L. Green, one of its employees, and Steve Allen a well known entertainer, for whom the Saphier Agency had acted as agent, under what hereinafter will be called the "Saphier contracts", were negotiating a change in their relationships culminating in the execution on November 3, 1953 of the contract which is the subject of this lawsuit.

The "Saphier contracts" with Steve Allen contained the type of provision which AFTRA was striving to eliminate in contracts between entertainers and their agents. Saphier and Steve Allen, on May 1, 1952, had entered into a contract for Saphier to act as Allen's agent for a period of three years, i. e., until April 30, 1955. The agent, Saphier, was to receive a commission of 10% of Allen's gross return in the field of television, earned or received by him *during the term of the agreement:*

And, under a provision, a portion of which AFTRA Rule 12–B proscribes since July 23, 1953, Saphier was also to receive a commission on Allen's gross return from television earned or received by him *after the termination date of the agreement:*

(1) On all employment contracts Allen entered into or negotiated during the

term May 1, 1952–April 30, 1955 with any employers, and

(2) Upon modifications, renewals, and extensions of such employment contracts.

(3) It was further provided that if any agreement or contract of employment was entered into within 120 days after the expiration or termination of *any* agreement with the same company or sponsor, it was to be deemed an extension or substitution of the *original contract* of employment.

The unfairness of such provision is apparent. The entertainer may find himself tied forever to a sort of serfdom, and end up paying two full commissions, or perhaps more than that to as many different agents.

It is small wonder then, that on July 23, 1953, AFTRA adopted Rule 12–B which provided that "all existing agency contracts" were modified to include the provisions of Exhibit "C" of the standard AFTRA exclusive agency contract under Rule 12–B.

This was no minor change in the agency contracts. It was widely viewed as a significant and extremely important one of sweeping application.

Exhibit "C" of the standard AFTRA exclusive agency contract provided:

"An artist may make a contract more, but not less, favorable to him than the form of contract specified in the regulations. No deviation, addition or deletion shall be made in the contract save with the written approval of AFTRA. * * * which will be granted if the contract in fact be more favorable to the artist."

(Section XII(B)).

\* \* \* \* \* \*

"Agency contracts with AFTRA members relating to the television field within the scope of these regulations shall be modified in accordance with this Rule 12–B if such contracts have not expired on or before July 21, 1953."

(Section XII C(4)).

\* \* \* \* \* \*

"Except as in this section otherwise provided all existing agency contracts between franchised agents and artists are hereby modified in accordance with these regulations, including the provisions of the form agency contracts attached to these regulations, and in accordance with the application for franchise, for the benefit of AFTRA and all such artists without any further notice or action. * * *"

(Section XIV A).

Paragraph 4(d) of Exhibit "C" defines the period of time during which an agent is entitled to commissions *after the expiration of his contract,* and provides:

"The Agent shall be entitled to the aforesaid commissions after the expiration of the term specified herein, for so long a period thereafter as the artist continues to receive moneys or other consideration under or upon employment contracts entered into by the artist during the term specified herein, including moneys or other consideration received by the Artist under the extended term of such employment contracts, *resulting from the exercise of an option or options given an employer* under such employment contracts, extending the term of such employment contracts, whether such options be exercised prior to or after the expiration of the term specified herein."

As we have seen, the term of the Saphier Agency contracts with Allen expired April 30, 1955. None of the employment contracts entered into by Allen prior to this expiration date was extended because of *"the exercise of an option or options"* given to the employer of Allen in such contracts. Accordingly, any contracts entered into by or on behalf of Allen *after* April 30, 1955, under Rule 12–B, were not extended terms of such contracts.

There can be no doubt that the Saphier-Allen Agency contract of May 1, 1952 was modified by AFTRA Rule 12–B. Saphier and Allen are members of AFTRA and bound by its rules and regu-

lations. The contract was on July 23, 1953, when Rule 12–B was adopted, an "existing" agency contract between a franchised agent and an artist.

It was not then "suspended" by the agreement, which is the subject of this lawsuit, executed on November 3, 1953, by plaintiff, its employee the defendant, and its client Allen. And, this is true though this agreement was dated May 30, 1953. It could not be operative until executed. It is, moreover, the view of the court that if the contract of May 1, 1952 *is* assumed to be "suspended" by the agreement of November 3, 1953, it is nevertheless an "existing" agency contract within the meaning of AFTRA Rule 12–B, which includes "all" existing agency contracts. The suspension was to be lifted in certain contingencies spelled out in the agreement of November 3, 1953, and the contract restored to full vigor. Rule 12–B doesn't wait upon that event, it attaches at once. There is enough of a contractual interest to which to attach meanwhile. In any event, Saphier by affidavit in the record has conceded that the Saphier-Allen Agency contract of May 1, 1952 was modified by Rule 12–B. And in his testimony at the trial in the instant case, Saphier further conceded that if the suspension were lifted and the "Saphier" contract "comes back" it would "come back" with Rule 12–B in it.

Finally, as between Saphier and Allen, at least, the matter is set at rest as to the agreement of May 1, 1952 as well as that of November 3, 1953 by the adjudication of the arbitration tribunal in the matter of the arbitration between James L. Saphier Agency, Inc., and Jules L. Green and Steve Allen. In a decision dated and acknowledged on the 11th day of July, 1957, the arbitrators made an award which was confirmed by the Supreme Court of the State of New York, on August 11, 1959. In their opinion the arbitrators hold:

"All of the pertinent provisions of Rule 12–B are consequently imported into the agreement of May 30, 1953, and into the *underlying "Saphier" contracts* to which it relates." At least as between Allen and Saphier, therefore, the matter is *res judicata.*

As to Allen, all of the pertinent provisions of Rule 12–B are imported into *both* agreements, (1) the "Saphier" Agency contracts with Allen, and (2) the agreement which was executed November 3, 1953, to which Saphier, Allen and Green were parties.

But, as to Green, the contention of Saphier is that Rule 12–B is not imported into either agreement. The argument runs that Rule 12–B is not imported into the agreement of November 3, 1953 because, (1) it was not an "agency contract" within the Rule, but a "settlement agreement" resulting from the re-negotiation of the affairs of Saphier, Allen and Green; and (2) Green was not a franchised agent of AFTRA.

Further, the argument is that Rule 12–B is not imported into the underlying "Saphier contracts", as to Green, because the terms of those contracts were incorporated into the November 3, 1953 agreement by reference as is, that is to say, as originally drafted, and not as modified by Rule 12–B.

So, we are asked by plaintiff to construe the modification agreement of November 3, 1953 one way as to Allen and another as to Green. Plaintiff claims 3½% commission under the November 3, 1953 agreement and underlying "Saphier contracts" for a period after their expiration on the theory that the November 3, 1953 contract itself does not include AFTRA Rule 12–B. And this is done though it cannot be questioned that as to Allen Rule 12–B is imported into that agreement and as well into the underlying "Saphier contracts" incorporated in it by reference.

This agreement of November 3, 1953 resulted from the negotiations between plaintiff Saphier, defendant Green, and Steve Allen looking toward a change in their relationships. Allen was discontented with his representation by Saphier and wanted to be released from his contract. The plaintiff Saphier had expressed dissatisfaction with defendant

Green's performance and planned to replace him in the New York office. Green had been in personal charge of Allen and he desired that Green continue to represent him. Negotiations began for the release by Saphier of a restrictive covenant contained in the employment agreement between him and Green, and for an agreement whereby the defendant Green in his individual capacity would undertake the personal management and representation of Allen for his own account.

The restrictive covenant barred the defendant from soliciting plaintiff's clients for two years after the expiration of his employment, and provided that sums received by him from clients of plaintiff in violation of the agreement should be held in trust.

Extended discussions and negotiations during the summer and fall resulted in the written agreement executed November 3, 1953.

Plaintiff Saphier admits, that by this agreement "the. defendant was relieved of the restrictive covenant, and thus the way was paved for the defendant to undertake the management of Allen", and that Saphier "approved the engagement of the defendant by Allen as personal representative and manager of Allen. The plaintiff also approved a press announcement 'that Green will act as agent for Allen'."

This agreement, after acknowledging that the contracts entered into between the plaintiff and Allen dated May 1, 1952 "are in full force and effect", provides:

1) That "concurrently herewith Allen is entering into agency contracts with Green (herein called 'the Green contracts'), including the fields covered by, and for the commissions at least equal to those provided for in, the Saphier contracts, and for terms at least as long as the unexpired portion of the terms of the Saphier contracts" (par. 1B).

2) That during "the effective period of the Green contracts, Allen will pay the commissions required to be paid by him by the Saphier contracts" during each yearly period of the Saphier contracts, 65% of such commissions to be paid to Green and 35% to Saphier. "The effective period of the Green contracts" is defined as the period commencing May 30, 1953 to and including May 29, 1955, "plus the period thereafter during which Saphier would be entitled to commissions under the Saphier contracts according to their terms" (par. 2).

3) That all of Saphier's obligations under its contracts with Allen are suspended during the effective period of the Green contracts, and that Saphier "is under no obligation to render any services to Allen during such suspension period" (par. 3).

4) That "the effective period of the Green contracts will expire upon the termination of the Green contracts for any reason whatsoever, whether by Allen, for cause or otherwise. * * *" (par. 4).

5) That Saphier's agreement with Allen dated May 1, 1952 is not terminated, but merely suspended during the "effective period of the Green contracts" and subject to reinstatement if Green and Allen terminate their relationship for any reason whatever prior to April 30, 1955; that in the event of such termination, the agreement of the plaintiff and Allen dated May 1, 1952 is to be reinstated in full force and effect for the balance of its term, as if it had not been suspended (par. 4).

6) That during the effective period of the Green contracts, Allen shall not be obligated for the payment of commissions, in the aggregate, in excess of 10% to both Saphier and Green (par. 5).

7) That the agreement shall not be construed as or constitute a partnership or joint venture between Green and Saphier (par. 9).

8) That payments to Saphier under the terms of this agreement are made the obligation of Allen (pars. 2, 5, 6).

The principal question for determination here is whether the references to the "Saphier contracts" in paragraphs 1 and 2 above incorporate them by reference as they were originally drawn, or, as contended by the defendant, as the Saphier-Allen Agency contracts were modified by AFTRA Rule 12-B.

This identical issue was presented to the arbitration tribunal and was decided by the arbitrators.

In a decision dated and acknowledged on the 11th day of July, 1957, the arbitrators, after full hearings, decided:

"1) The claim of James L. Saphier Agency against Steve Allen is disallowed.

"2) We find that we lack jurisdiction to make an award on the claim of James L. Saphier Agency, Inc. against Jules L. Green."

In their opinion, the arbitrators held:

"The controversy between the claimant and the respondents arises out of a written contract dated May 30, 1953, but actually executed sometime after the effective date of Rule 12-B. * * *

"After careful analysis of the agreement of May 30, 1953, in the light of the other relevant exhibits that have been submitted for our consideration, we have concluded that insofar as it relates to the relationship between Saphier and Allen, that agreement can fairly be characterized as one that provides at least 'in part for agency services' and is, therefore, within the scope of the definition of an 'agency contract'. * * *

* * * * * *

"All of the pertinent provisions of Rule 12-B are consequently imported into the agreement of May 30, 1953, and into the underlying 'Saphier contracts' to which it relates. In that the 1955 'Tonight' agreements between Allen, his corporations and The National Broadcasting Company concededly did not result from the exercise of any option contained in

the 1954 'Tonight' agreements, Rule 12-B precludes the recovery by Saphier of any commissions from Allen on the two subsequent sets of agreements. The commissions which Saphier was entitled to receive in connection with the 1954 'Tonight' agreements have admittedly been paid. It follows that Saphier's claims against respondent Allen must be, and the same hereby are, dismissed on the merits."

As to plaintiff's claim against the defendant herein, the arbitrators held that the compulsory arbitration under Rule 12-B has no application; and since the agreement dated May 30, 1953 contains no arbitration clause, and there had been no independent submission to arbitration under the Civil Practice Act, § 1448 et seq., the controversy between these parties was not arbitrable. The arbitrators concluded: "In leaving these parties to seek their remedies in a proper forum, we do so without prejudice and without intimating any views as to the merits."

In brief, the arbitrators determined that Allen's agreements of employment, under which the plaintiff claimed commissions, did not result from the exercise of any option contained in any agreement and that the plaintiff was not entitled to any commissions from Allen beyond those which it had already received.

This award in arbitration was confirmed by the Supreme Court of the State of New York, County of New York, and judgment on the award was subsequently entered in the office of the New York County Clerk, adjudging that the claim of the plaintiff against Steve Allen, based on the contract dated May 30, 1953, should be dismissed.

Plaintiff Saphier's claim, if any, against Steve Allen has been set at rest by the arbitrators' award. It is *res judicata*.

With respect to his claim against defendant Green, the plaintiff is collaterally estopped from maintaining this action. The issues here were fully litigated in the arbitration proceeding and decided against the plaintiff on the merits.

■ In Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 928, 152 A.L.R. 1187, certiorari denied 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579, Judge Learned Hand noted;

"It is of course well settled-law that a fact once decided in an earlier suit, is conclusively established between the parties (or their privies) in any later suit provided it was necessary to the result in the first suit."

■ A decision by arbitrators is as binding and conclusive under the doctrine of *res judicata* and estoppel as the judgment of a court (Springs Cotton Mills v. Buster Boy Suit Co., Inc., 275 App.Div. 196, 88 N.Y.S.2d 295; New York Civil Practice Act, § 1466).

The test is whether the issues in this action were (a) litigated or involved in the arbitration proceeding or (b) properly could and should have been litigated there. To the extent that the facts and law which are material or incidental to the issues in this action meet this test, the plaintiff is estopped by the arbitration award. The rationale for this rule is plain. Any other result would permit a different judgment in this action, the effect of which would be to "destroy or impair interests established by the first". Schuykill Fuel Corporation v. B. & C. Nieberg Realty Corporation, 250 N.Y. 304, 165 N.E. 456.

The New York Court of Appeals recently held in Hinchey v. Sellers, 7 N.Y. 2d 287, 197 N.Y.S.2d 129, 134, 165 N.E. 2d 156 (decided December 30, 1959): "The doctrine of collateral estoppel 'is essentially a rule of justice and fairness', and the essence of the rule is 'that a question once tried out should not be relitigated between the same parties or their privies'."

The issues raised in the arbitration proceeding, clearly defined in the plaintiff's Demand for Arbitration and in the decision of the arbitrators, were:

1. The validity and effect of the agreement dated May 30, 1953 (executed November 3, 1953) between the plaintiff, on one hand, and Steve Allen and the defendant, on the other hand.

2. The validity and effect of the 1952 agency contracts between the plaintiff and Allen.

3. Whether or not the plaintiff was entitled to recover from Allen commissions accruing subsequent to September 23, 1955 under any of the foregoing contracts.

The arbitrators decided that plaintiff could not recover the commissions claimed under these agreements and that the plaintiff had already received all commissions it was entitled to thereunder.

The *issues in this action* which were litigated and determined in the arbitration proceeding are as follows:

1. *The validity and effect of the agreement dated May 30, 1953 upon which the plaintiff based its claim.* The arbitrators held that this agreement (a) was an "agency agreement" within the rules of AFTRA and (b) that it was executed after the effective date of Rule 12–B.

2. *The effect of the 1952 agency agreement between the plaintiff and Steve Allen.* The plaintiff's claim for recovery of commissions was based on the language of this agreement, which contained all of the essential terms on which the plaintiff sought recovery—the commissions payable to the plaintiff, the period of time during which such commissions were to be paid and the sources of Allen's earnings upon which the commissions were computed. The arbitrators held that *"all of the pertinent provisions of Rule 12–B are consequently imported"* not only into the agreement of May 30, 1953 but also *"into the underlying 'Saphier contracts' (agreement dated May 1, 1952) to which it relates"*.

3. *Whether or not Steve Allen breached the May 30, 1953 agreement or any of the 1952 agency agreements between the plaintiff and Allen.* After expressly finding that AFTRA Rule 12–B is "imported into

the agreement of May 30, 1953 and into the underlying Saphier contracts to which it relates", the arbitrators dismissed the plaintiff's claim for commissions "on the merits". Thus, it has been legally adjudicated that Steve Allen did not breach any of the agreements to which he was a party with the plaintiff and is not indebted to the plaintiff for commissions on any contract or in any amount.

4. *Whether or not Steve Allen had the right to make a contract with NBC for a term of one year from September 1954 to September 1955 without the inclusion of any option provision.* This issue was raised by the plaintiff in the arbitration proceeding and was decided adversely to it. The arbitrators further held that Rule 12–B precludes the recovery by the plaintiff of any commissions on the very agreement entered into by Allen on which the plaintiff seeks to recover commissions in this action.

The arbitrators decided that plaintiff is not entitled to the commissions claimed under the 1952 agreement between the plaintiff and Allen or under the agreement dated May 30, 1953 entered into by the plaintiff, the defendant and Allen. This legally adjudicated disability attaches fully to the plaintiff's claim for commissions as well as to every other claim for payment of any moneys alleged to be due under these agreements. Thus, there is attached to the plaintiff's claim an adjudicated infirmity which puts it at rest forever.

This action deals with precisely the same issues which were before the arbitrators. It appears to be an attempt to circumvent their determination. There is in effect a legally valid and conclusive determination that Steve Allen did not breach any agreement with the plaintiff and that the plaintiff is not entitled to recover any commissions from Allen for any time subsequent to the last payment made by Allen and received by the plaintiff on September 23,

1955. This is the very issue on which the plaintiff seeks to recover in this action from the defendant, whose relation with Allen is that of agent and principal.

Israel v. Wood Dolson Company, 1956, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 4, 134 N. E.2d 97 is authority for the proposition that the adjudication in the arbitration proceeding (that the plaintiff is not entitled to any recovery from Steve Allen under the contracts dated May 30, 1953 and May 1, 1952), collaterally estops the plaintiff from asserting its present claim against this defendant.

Chief Judge Conway, in the opinion of the Court of Appeals wrote:

"It will be seen, therefore, that the fact that a party has not had his day in court on an issue *as against a particular litigant* is not decisive in determining whether the defense of *res judicata* is applicable.

"In cases involving the relationship of principal and agent, master and servant, or indemnitor and indemnitee, the liability of more than one party turns on, or is dependent upon identical issues. In such situations when the complaining party has been given a full opportunity to litigate those issues against one of the parties, and has been defeated on grounds other than a personal defense, he is not permitted to relitigate the same issue in a new action against the other. The unilateral character of the estoppel in such cases is warranted by the policy of the doctrine of *res judicata*—that there be an end to litigation.

"So, here, the liability of Wood Dolson and Gross turns on an identical issue. For Israel to succeed on his second cause of action against Gross, he would have to prove: (1) the existence of a valid contract between Wood Dolson and himself; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach of that contract by Wood Dolson; and (4) damages. See, e. g., Lamb

v. S. Cheney & Son, 227 N.Y. 418, 125 N.E. 817; Hornstein v. Podwitz, 254 N.Y. 443, 173 N.E. 674, 84 A.L.R. 1. An essential element of the case against Gross is the breach of the contract by Wood Dolson. Israel's second cause of action must fail if there was no such breach. Israel has had a full opportunity to prove such breach in his suit against Wood Dolson in a court of competent jurisdiction. That court has found no breach and, under the principle mentioned above, plaintiff may not relitigate that issue."

The Court of Appeals concluded that "in determining the applicability of the doctrine of *res judicata* as a defense, the test to be applied is that of 'identity of issues' ".

There is such identity of the issues in this case and those raised in the arbitration proceeding.

The Appellate Division, First Department, in its opinion in the Wood Dolson Company case, 285 App.Div. 719, 140 N.Y.S.2d 663, 665, affirmed in the Court of Appeals holding referred to above, contains this appropriate language:

"The basic reason for the rule of res judicata is that in the interest of the orderly administration of justice issues once fully tried should be deemed conclusively determined as to all future litigation where, at least, no injustice would result from the application of the rule. Under the present circumstances, where plaintiff had a full and untrammeled opportunity to establish the breach of contract by Wood Dolson and failed to succeed in a suit entirely controlled by him, it would seem that he should not be entitled to a second chance to prove the breach in an action against one charged with inducing the same."

The Appellate Division cited the *Restatement of the Law of Judgments* which, in the language of the opinion, "recognizes the present situation as a typical instance where an estoppel should arise." The court quoted the Restatement of the Law of Judgments as follows:

"99. Where Liability of a Person is Based Solely Upon the Act of Another.

"A valid judgment on the merits and not based on a personal defense, in favor of a person charged with the commission of a tort or a breach of contract, bars a subsequent action by the plaintiff against another responsible for the conduct of such person if the action is based solely upon the existence of a tort or breach of contract by such person, whether or not the other person has a right of indemnity.

"*Comment*:

" * * * In the situations within the rule stated in this section, the person against whom the rule works adversely has had his day in court and it is not unfair that if he is unsuccessful in his action against the alleged tortfeasor or contract breaker, he should be deprived of an action against another, even though the other would have no right of indemnity against the defendant in the first action were judgment rendered against him. * * *

"Illustrations:

"1. A, without privilege, induces B to break a contract with C. In an action for breach of contract by C against B the court finds that B committed no breach of contract, not because of any personal privilege but because the terms of the contract did not provide against the conduct charged to be a breach of contract. In a subsequent action by C against A the prior judgment is a complete defense."

The express terms of the agreement dated May 30, 1953 placed any obligation for the payment of commissions to the plaintiff upon Allen. It is significant, that in the drafting of the agreement dated May 30, 1953, the plaintiff's attorneys provided that *Allen, and Allen alone*, should be responsible and obligated

for the payment of any commissions to the plaintiff. No liability for payments is imposed upon Green. The contract was cutely phrased so as to place the obligation on Allen to make all payments directly to Saphier. Now that it has been judicially determined that there is no obligation whatever upon Allen to make any further payments to the plaintiff and that the plaintiff is not entitled to any further commissions under its contract, the plaintiff seeks to attach this claim to the defendant. No such liability on the defendant's part can be found in the agreement.

That the agreement of the parties dated May 30, 1953 limits the obligation for payments to Allen, conclusively appears from the following provisions in the instrument:

Paragraph 2 provides that "*Allen,* during the 'effective period of the Green contracts' will pay commissions required to be paid by him under the Saphier contracts", in the manner provided in this paragraph.

Paragraph 5 provides the conditions under which "*Allen* will be obligated for the payment of commissions in excess of 10% in the aggregate to both Saphier and Green".

Paragraph 6 provides that "*Allen* agrees to pay Saphier the commissions due him under paragraph 2 hereof at the same time that such payments would have been due to Saphier, but" etc. Further, it provides that Saphier accepts the commissions specified "as full and complete payment by *Allen* to Saphier of commissions under the Saphier contracts during the suspension period".

Paragraph 7 provides that Saphier "may assign any commissions due him hereunder, on condition that he notifies *Allen* in writing of such assignment".

Nowhere, in the agreement, is there any obligation on the part of this defendant to make any payment to the plaintiff. Nor is there any provision in the agreement, or in any other instrument, for this defendant to act as guarantor of any obligation of Allen to the plaintiff, as required by Section 31 of the New York Personal Property Law. This, of course, becomes academic because it has been conclusively adjudicated that Allen is not obligated to the plaintiff in any manner or respect whatever.

There is no merit or substance to the plaintiff's contention that it is damaged by the failure of Allen and the defendant Green to enter into a separate and independent agency contract.

In the Fourth cause of action set forth in its complaint, the plaintiff seeks damages for the alleged failure, on the part of the defendant, to comply with paragraph 1B of the agreement dated May 30, 1953, which provides:

"Concurrently herewith Allen is entering into agency contracts with Green (herein called 'the Green contracts'), including the fields covered by and for the commissions at least equal to those provided for in, the Saphier contracts, and for terms at least as long as the unexpired portion of the terms of the Saphier contracts."

The plaintiff cannot dispute that it has received from Allen, and was fully paid by him, all commissions due to it under the contracts dated May 1, 1952 and May 30, 1953. In fact, plaintiff has conceded that it would not be entitled to any further payments from Allen under these contracts, and this has been adjudicated. The plaintiff contends, however, that the agreement of May 30, 1953 creates a different situation in its favor against the defendant. This argument is based on the theory that Allen should or would pay to the defendant more, in the way of commissions, than he was obligated to pay to the plaintiff under the same contract and that Allen would give the defendant a contract more generous and more favorable than the contract under which Allen was obligated to the plaintiff. In essence, plaintiff here contends that Allen and Green were to enter into an agreement obligating Allen to pay

commissions provided in the agreement of May 1, 1952 *as if Rule 12–B had never taken effect* and as if Rule 12–B had no application to that agreement. This result, the plaintiff contends, could be effected because the defendant, Green, was not a member of AFTRA.

The agreement dated May 30, 1953 is between the plaintiff Saphier, Steve Allen and the defendant, Jules L. Green. Paragraph 1B provides that "concurrently herewith Allen is entering into agency contracts with Green". Whatever obligation is created by this paragraph is for Allen to enter into an agency contract with Green. From the wording of the clause, it appears that the primary desire and purpose of the plaintiff was that *Allen* enter into such contract with Green. In any event, whatever obligation is created under this paragraph is one imposed upon Allen *with* Green. It has already been conclusively adjudicated in arbitration that Steve Allen did not breach any terms of his agreement with the plaintiff and that the plaintiff is not entitled to any recovery whatever from Steve Allen arising out of the agreements dated May 1, 1952 and May 30, 1953. Under these circumstances, the plaintiff cannot now legally claim damages for breach of the same clause in the same agreement from the defendant Green (Israel v. Wood Dolson Company, supra).

Moreover, with regard to this provision of the agreement:

1) There is no reason to suppose that Allen would, in any event, agree to pay more to Green than he was required to pay to the plaintiff. The agreement dated May 30, 1953 created no such obligation on Allen's part. The contract *Allen* was to enter into with Green (par. 1B) was for the payment of commissions "at least equal to those provided for in the Saphier contracts and for terms at least as long as the unexpired portion of the terms of the Saphier contracts".

The so-called "Saphier agreements" of the plaintiff Saphier and Allen dated May 1, 1952 had been modified by the adoption of AFTRA Rule 12–B effective July 23, 1953. This was determined in the arbitration proceeding.

The agreement dated May 30, 1953 was not executed until November 3, 1953, over three months after Rule 12–B became effective.

The contracting parties in the latter agreement are Saphier, Allen and Green. One instrument contains three contracts, (1) Saphier's contract with Allen; (2) Saphier's contract with Green; and (3) Allen's and Green's contract between themselves. All three undertakings are interrelated.

The arbitrators also determined that the provisions of AFTRA Rule 12–B were imported into this November 3, 1953 agreement as between the plaintiff Saphier and Allen.

The Allen and Green contract between themselves in the November 3, 1953 instrument was to enter into agency contracts "including the fields covered by and for the commissions at least equal to those provided for in, the Saphier contracts, and for terms of at least as long as the unexpired portion of the term of the Saphier contracts."

The provisions of AFTRA Rule 12–B, must be imported into the November 3, 1953 agreement as between Allen and Green. This beyond doubt was an "agency contract." Allen was a member of AFTRA and bound by its rules. He could not enter into an agency contract more burdensome to himself than that provided by Rule 12–B. Allen and Green were embarking upon a new relationship which they must have assumed would have some permanency and hence to be in compliance with AFTRA rules.

These agreements of November 3, 1953 and AFTRA Rule 12–B were being negotiated during the same period of time. Rule 12–B was the subject of much discussion in the industry. There is no question that all three parties to the November 3, 1953 agreement were well informed and knew all about it. It had been adopted for over three months.

If the November 3, 1953 contract is to be construed as importing Rule 12–B in

the Saphier-Allen portion of it which now is res judicata, and if the Allen-Green portion is construed also to import Rule 12–B, which we think it must, how can it be construed differently as to the Saphier-Green contract so closely related in the same instrument? If Saphier is assumed to have intended AFTRA Rule 12–B as to Allen, must he not be assumed to have intended the same as to Green? In common sense and good conscience the contract should mean the same thing for Green as for Allen. How can it be otherwise?

2) Paragraph 1B does not require that Green and Allen enter into a *separate* and *independent* contract of agency. The very wording of this agreement: *"Concurrently herewith* Allen is entering into agency contracts with Green"*, indicates that such agreement between Green and Allen is entered into by their very execution of this agreement dated May 30, 1953 and that, on the signing of this agreement, Green and Allen have agreed that Green is to act as agent "for commissions at least equal to those provided for in, the Saphier contracts, and for terms at least as long as the unexpired portion of the terms of the Saphier contracts". There is no requirement in the agreement that a separate, written agency contract be entered into.

3) In any event, there has been full performance by Green and Allen on the basis of their having entered into an agency contract as provided in Par. 1B. All payments have been made to the plaintiff and received by the plaintiff for the full unexpired term of this agreement with Allen, and on the terms provided for therein. Plaintiff has no claim for any further payments from Allen. This has been adjudicated and is conceded by the plaintiff in affidavits submitted by it in the present action. In fact, the plaintiff has received and accepted all benefits provided for it in the agreement.

4) The further claim that Green was not a member of AFTRA and, therefore, not bound by Rule 12–B of that organization and that he could have received commissions in excess of those which the plaintiff could receive, proceeds on the erroneous and baseless assumption that Allen would be willing to pay more than he was required to pay under the then existing terms of the Saphier agreement and under the Rules and Regulations of AFTRA. Allen could not enter into such agreement under the Rules and Regulations of AFTRA and without this organization's express consent. In addition, under the plaintiff Saphier's agreement with AFTRA, it undertook that "it will not evade, circumvent or violate, or seek to evade, circumvent or violate, those regulations (Rule 12–B) or any part thereof either *directly* or *indirectly*."

5) Moreover, if the defendant had entered into a separate, formal written or other agency contract with Allen, an AFTRA performer, in October or November, 1953, this agency contract would also have been subject to Rule 12–B.

6) When Allen refused to grant an option to NBC in contracts entered into prior to April 30, 1955, the defendant Green, no less than the plaintiff, was precluded from claiming commissions on subsequent contracts with the broadcasting company so long as they did not result from the exercise of any options in the existing contract.

7) Notwithstanding all that has been stated above, if an agreement was or could be made with Allen for commissions in the manner provided between the plaintiff and Allen before Rule 12–B took effect, it would create a liability on Allen's part for the payment of additional amounts to the plaintiff. As stated above, payments to the plaintiff, under the agreement dated May 30, 1953, are made the sole obligation and undertaking of Allen. By the provisions of Rule 12–B, Allen would not be permitted to make payments additional to or in circumvention of the provisions of this rule and the plaintiff, as a franchised AFTRA agent, would not be permitted to receive such payments in circumvention of the rule.

This is a motion to dismiss made at the conclusion of all the evidence. There

are seven causes of action alleged in the complaint:

*First*: That in becoming the agent for Steve Allen in 1953, the defendant breached his 1950 employment contract which prohibited him from soliciting plaintiff's clients for two years after expiration of the employment term.

But Saphier gave his full and express consent in the modification agreement executed November 3, 1953, that Green become the agent for Steve Allen, and admitted as much in affidavits filed in this court. The president of plaintiff swore to an affidavit on the 30th of November, 1959 in which he admits that, by the terms of the agreement dated May 30, 1953 "the defendant was relieved of the restrictive covenants, and thus the way was paved for the defendant to undertake the management of Allen". He further stated that by entering into this agreement the plaintiff "approved" Allen's management by the defendant, as follows:

"It will be noted that by entering into Exhibit "F", the plaintiff approved the engagement of the defendant by Allen as personal representative and manager of Allen. Because of the restrictive covenant above quoted, the defendant could not undertake management of Allen without such consent. The plaintiff also approved a press announcement 'that Green will act as agent for Allen' * * *"

*Second*: That defendant, in the Spring of 1953, persuaded Steve Allen to breach his agency contracts with plaintiff.

Allen has never breached his agency contracts with plaintiff, as has been amply demonstrated above. That question is, in any event, res judicata. And, the cause of action, if any, is barred by the statute of limitations in that it did not occur within three years before the commencement of the action. Polo v. Kibrick, Sup., 120 N.Y.S.2d 49, Steuer, J.; C.P.A. Sec. 49, sub'd. 7.

*Third*: That plaintiff was induced to enter into the agreement dated May 30, 1953 by defendant's allegedly false representations that (a) defendant would become Steve Allen's personal representative and manager for a period of time at least equal to the period of the plaintiff's agency contracts, and (b) Steve Allen would pay a 10% agency commission during that period of time, of which 3.5% would be paid directly by Steve Allen to the plaintiff, and (c) Allen would be a party to an instrument of settlement and would simultaneously enter into a formal agreement embracing the matters of (a) and (b).

The plaintiff's third cause of action is grounded in fraud. In essence, the fraud alleged in the complaint is that when the defendant entered into the contract he did not intend to perform it.

The evidence in this record cannot be said fairly and reasonably to warrant such a finding, and hence there is no jury issue.

From what heretofore has been stated, it is apparent that the plaintiff has no valid claim against the defendant based on breach of contract. The determination in arbitration has established that the plaintiff has already received all the commissions and payments that it was entitled to receive under the contract which it entered into with the defendant and Allen November 3, 1953 and cannot recover upon the contract. The plaintiff seeks to escape this result by suing for fraud.

There is really but one claim in this case and that is the claim to recover commissions under its written agreement with the defendant and Steve Allen. That claim has already been litigated and determined in the arbitration proceeding. There is an adjudication that the plaintiff has suffered no damage and is entitled to no recovery based on the said agreements.

*Fourth*: That defendant breached that portion of the May 30, 1953

agreement which provided that he was concurrently entering into agency contracts with Steve Allen.

This matter is fully discussed above.

There was one contract signed by all three parties, Saphier, Green and Allen. And, Saphier has been paid in full all commissions he has coming from Allen. Allen did not violate the agreement. These matters are res judicata by virtue of the award in arbitration. No further agency contracts were contemplated. It must be considered to have been done in the one instrument.

*Fifth*: That defendant, to enrich himself, induced Steve Allen to discontinue payments to plaintiff sooner than the expiration of the terms of the 1952 agency contracts.

In paragraph thirty seven of the complaint it is averred that "unjust enrichment of the defendant has taken place through his own wrongful acts in failing to fulfill his undertakings to the plaintiff under the November 3, 1953 agreement."

Plaintiff had no right to the extra payments. There is no unjust enrichment because there is no breach of a duty. Allen owes plaintiff nothing. That is res judicata. Allen's was the only obligation to pay commissions to Saphier. Paragraph 9 of the agreement makes this clear beyond peradventure for it provides that the agreement shall not be construed as or constitute a partnership or joint venture between Green and Saphier. Allen was to pay each his separate share. Saphier and Green were not sharing.

If the contract is violated there is liability, if not, there is none. The subject is fully discussed above.

*Sixth*: That defendant used confidential information to cause plaintiff's relationship with Steve Allen to deteriorate and to induce Steve Allen to sever with plaintiff and engage defendant as his agent.

There is no evidence to sustain this claim. Saphier testified that he knew of no inducement or persuasion. Allen denied it. It is barred by the three year statute of limitations. And, the November 3, 1953 agreement meant to give Green the right to do what he did.

*Seventh*: That the November 3, 1953 agreement contained an "implicit" obligation for defendant to pay or cause to be paid by Steve Allen the 3.5% commission which plaintiff is still claiming in this action.

All payments to Saphier were to be made by Allen in the agreement of May 30, 1953. None was to be made by Green.

The arbitrators' decision is an adjudication that Allen is not liable on that contract or the underlying "Saphier contracts." Saphier's counsel made the same argument before the arbitrators.

The carefully phrased express provisions of the agreement foreclose any implication of the sort asserted here.

The motion to dismiss is granted.